FILED
2024 Oct-15  AM 09:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

FILED

2024 OCT 11  P 3: 41

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JULIEN BARRIEU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | |
| CITY OF HUNTSVILLE, ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

## I.    INTRODUCTION

1.    This is an action for declaratory judgment, equitable relief, and money damages, instituted to secure the protection of and to redress the deprivation of rights secured through Title VII of the Act of Congress commonly known as "The Civil Rights Act of 1964", as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq. (hereinafter "Title VII"), which provides for relief against discrimination in employment on the basis of national origin.  Plaintiff seeks compensatory damages, punitive damages, costs, attorney's fees and requests a jury trial pursuant to 42 U.S.C.  § 1981a.

## II.    JURISDICTION AND VENUE

2.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(4); and 42 U.S.C. § 2000e-5(f)(3).

3.    The unlawful employment practices and unlawful acts alleged herein were committed by Defendants within Madison County, the State of Alabama.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(g).

## III.   **PARTIES**

4.      Plaintiff, Julien Barrieu, is a naturalized citizen of the United States, who was born in France.  Plaintiff was employed by the City of Huntsville, Alabama, at all times relevant to this Complaint.

5.      Defendant City of Huntsville, Alabama ("City"), is a municipal corporation under the laws of Alabama, and an employer in an industry affecting commerce and otherwise is an employer within the meaning of 42 U.S.C. §_2000e(a), (b).  At all times relevant to this action, the City has employed at least fifteen (15) or more employees and maintained operations in the Northern District of Alabama.

## IV.   **ADMINISTRATIVE EXHAUSTION**

6.      Plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission ( the "EEOC") (Charge 420-2024-01850), in which he complained that Defendant City of Huntsville, Alabama, discriminated against him by subjecting him to discrimination based on national origin.

7.      Plaintiff's charge was filed on or about December 8, 2023, a copy of which is attached hereto as Exhibit A.  Plaintiff Amended his charge of discrimination on or about March 5, 2024, a copy of which is attached hereto as Exhibit B.

8.      Plaintiff received a Notice of Right to Sue, on or about July 16, 2024, a copy of which is attached hereto as Exhibit C.

9.      Plaintiff has filed suit within 90 days of receipt of the Notice of Right to Sue dated July 16, 2024.  This suit is timely filed.

10.      Plaintiff has fulfilled all conditions precedent to the institution of this action under Title VII.

2

## V.    STATEMENT OF FACTS

11.    Plaintiff was first employed by the City on or about February 20, 2023, as a police cadet. On or about July 7, 2023, he graduated from the Huntsville Police Academy, and became a sworn peace officer of the State of Alabama and a sworn probationary officer of the Huntsville Police Department ("HPD").

12.    The Plaintiff ("Officer Barrieu") was required to complete field training to become a regular member of the HPD, which he began immediately.

13.    In addition to speaking his native language, French, Officer Barrieu is a fluent English (and Spanish) speaker. He has lived in the United States since he was sixteen years old, was educated in the United States during high school and college, and he thinks and dreams in the English language.

14.    Beginning within the first two weeks of his employment with the City, and throughout employment with the City, Officer Barrieu was regularly and continuously subjected to derogatory comments, unfair discipline, unfairly held to higher performance standards than cadets and police officers native to the United States, his loyalty and character were unfairly questioned, and/or pressured and coerced to resign, and he was ultimately terminated, because of his national origin.

### Derogatory Comments During the Academy

15.    While attending the Police Academy, the instructors, called Training Assistants ("TA"), regularly and continuously made offensive comments to Officer Barrieu, based on his national origin, often openly in the presence of many others. Some of those comments are as follows:

A.    TA Snipes, regularly and openly berated Officer Barrieu and justified

3

his unfair treatment by stating, "You aren't American." TA Snipes also loudly, vulgarly and openly disparaged Officer Barrieu's native country, with comments such as, "We know the French are a bunch of p - ssies, they never won a war."

B.     During the "redman" exercise at the Academy, while Officer Barrieu was pinned under an obese Sergeant, so that his breathing was impaired, the Sergeant stated that France had never won wars, asked who was going to save [Officer Barrieu] now, asked if Officer Barrieu was going to surrender since there were no Americans to save him, stated that the Americans would not save him like they did at Normandy, and told Officer Barrieu to call the Americans for help if he wanted to be released.

**Language Barrier and Culture Gap Alleged During the Academy**

16.     The TA's regularly, continuously and offensively questioned Officer Barrieu's command of the English language, and understanding of American culture, often in the presence of many others.  Native born cadets and officers were not questioned similarly. Some of those incidents are as follows:

A.     TA Snipes repeatedly made erroneous and offensive pronouncements disparaging Officer Barrieu's English language skills, such as, "I know you don't understand what we are saying," "I know you don't speak English and cannot understand" and "I know that you have to translate this in your head."

B.     TA Bursh told Officer Barrieu that he needed a translator, and assigned Cadet Bell to be his translator.

4

C.      When tased during a training exercise, Officer Barrieu uttered an expletive. TA Snipes stated that was the first time that Officer Barrieu sounded like an American.

D.      During many meetings with the Sgt. and the TA's, Officer Barrieu was frequently told that he had communication problems, a language barrier, and that he had to translate in his head, and he was too slow because he was translating and that he needed to resign.

17.     The TA's regularly threatened/warned Officer Barrieu that he was not going to succeed, often in the presence of many others, even though he was performing as well as, or better than, native-born cadets who did succeed in becoming regular full-time Huntsville Police Officers. Native born cadets and officers, except the black female cadet, were not similarly threatened. Some of those incidents are as follows:

A.      TA McDowell threatened Officer Barrieu, saying "You don't belong here, and we are going to make sure you understand that real quick."

B.      TA Snipes stated, "I don't know how it is in France, but in American it is like this, and I don't think you understand," and "the two of you (Officer Barrieu and Officer Bell, the black female) will not graduate, and if you pass through the cracks, you will not pass FTO, I guarantee it, I promise you."

**Character and Loyalty Questioned During the Academy**

18.     The TA's repeatedly and openly questioned Officer Barrieu's character and loyalty to the United States, often in the presence of many others. The loyalty of native born cadets and officers was not questioned similarly. Some of those incidents are as

5

follows:

> A.    TA Snipes repeatedly asked Officer Barrieu, "Are you a Patriot?"
>
> B.    TA Bursh repeatedly stated to Officer Barrieu, "You are a mole," "You are a spy," and "If it had been two years ago, you probably would have stolen our jobs."

**Higher performance standards/ Unfair Discipline During the Academy**

19.    Officer Barrieu was regularly held to a higher standard of performance by the TA's than his native born classmates, and he was singled out for unfair discipline not meted out to native born cadets in similar severity or frequency. Some of those incidents are as follows:

> A.    Sgt. Bartley made Officer Barrieu stand by the American flag and recite the pledge of allegiance over and over as a punishment for cramping during a physical training test.
>
> B.    The TA's, especially TA Snipes and Boyer, cursed and shouted at Officer Barrieu regularly.
>
> C.    TA McDowell reprimanded Officer Barrieu for such things as normal body language and his normal facial expression and told him that he wanted to "smack the sh-t of you."
>
> D.    In an obvious effort to fail him, Officer Barrieu was required by TA Boyer to repeat the SSGT TEST multiple times, even after he had already passed it, the last time right on the eve of graduation.

20.    Throughout the Academy, on his objective academic evaluations in the police

academy, Officer Barrieu excelled. On subjective evaluations by the TA's, he unfairly received lower marks than his native born classmates.

**Pressured/Coerced to Resign During the Academy**

21.    The constant berating and abusive comments by the TA's, influenced some of Officer Barrieu's other classmates negatively.  Some were concerned to befriend him and afraid to partner with him. Native cadets and officers, were not similarly treated. Some of those incidents are as follows:

A.    Outside of Officer Barrieu's presence, TA McDowell promised incentives to the class if they used peer pressure to make Officer Barrieu quit. He also did this to Officer Bell, who resigned.

B.    TA McDowell stated, while looking directly at Officer Barrieu, that he would cancel 2000 burpees of punishment if someone, and we know who it is, quits.  Cadet Wilburn said Barrieu if you love us, you will quit.

C.    Officer Barrieu was asked to resign by Sgt. Bartley and all of the TA's except TA Brightwell.

D.    Cadet Pence once asked Officer Barrieu if he thought that he would speak like a normal person if he changed what he ate for lunch.

**Field Training**

22.    Despite his mistreatment and the distress that it caused, Officer Barrieu graduated from the Police Academy and entered field training.

23.    Lt. Hughes was the Director of the Police Academy, and a supervisor who

7

held or had been informally delegated the authority to fire, demote, discipline, transfer police cadets and police trainees. ("PT")

24.    Field training officers ("FTO") are the instructors during field training. On information and belief, Lt. Hughes has a history of assigning FTO Lueras to PT's who have been singled out, as persons who the Academy command officers and the TA's do not want to have the opportunity to successfully complete field training.

25.    Officer Barrieu was assigned to FTO Lueras, as his primary FTO.

26.    During field training, the campaign to terminate Officer Barrieu continued.

**Language Barrier and Culture Gap Continues to be Alleged During Field Training**

27.    As during the academy, the FTO's continuously and offensively questioned Officer Barrieu's command of the English language, and understanding of American culture.  This is mentioned on many occasions in his Daily Observation Reports (DOR).

**Pressure/Coercion to Resign Continues During Field Training**

28.    As during the academy, Lt. Hughes regularly threatened/warned Officer Barrieu that he was not going to succeed.  Examples:

29.    FTO Berger asked Officer Barrieu to resign nearly every day.

30.    FTO Lueras constantly expressed the opinion that Officer Barrieu was unsuited to police work.

**Higher performance standards/ Unfair Discipline During Field Training**

31.    As during the academy Officer Barrieu was regularly held to a higher standard of performance than his native classmates, and he was singled out for unfair discipline. Some of those incidents are as follows:

8

A.      Officer Barrieu was constantly reprimanded for failure to turn on his body camera.  Often, his camera was actually working.  On some occasions, Officer Barrieu's own body camera video footage captured FTO Lueras, and another FTO reprimanding him for not having his body camera on!

B.      FTO Lueras cursed Officer Barrieu for perceived mistakes during an incident at Home Depot. Officer Kingham witnessed this and was vocal in his disapproval of FTO's behavior toward Officer Barrieu.

32.     On multiple occasions during field training, Lt. Hughes called Officer Barrieu into her office and unfairly pressured him to resign, based upon reports of the TA's and FTO's. Lt. Hughes observed and oversaw the academy training and knew or should have known that the reports were biased against Officer Barrieu due to his national origin.

33.     On or about, August 30, 2023, before the specified time to complete FTO training, Officer Barrier was called into Lt. Hughes office and unfairly required to sign a performance contract, which required him to cure his perceived performance deficiencies by September 15, 2023, or face termination.  Upon information and belief, Officer Barrieu was the only PT required to sign a performance contract.

34.     The other PT's in field training were all  native born and at least some of them were struggling.  On information and belief, at least two of the native born struggling PT's had their field training extended by Lt. Hughes, significantly beyond the specified time allowed for successful completion, so that they could cure their deficiencies in performance.   Those PT's are working HPD officers today.

35.     Within one week, Lt. Hughes called Officer Barrieu back into her office and

9

asked him to resign.  When he refused, Lt. Hughes told Officer Barrieu that she had already decided not to recommend him for a permanent HPD position, and that there was nothing he could do, even if he made all "7's" (excelled) she would not recommend him.

36.    When Officer Barrieu still refused to resign, Lt. Hughes said she was sending the disciplinary paperwork and recommending his termination to the Chief of Police and that he only had a 5% chance of the Chief deciding differently. When Officer Barrieu advised that he would prefer to take his chances, Lt. Hughes stated that he actually had only a 2% chance of the Chief not terminating him.

37.    On September 15, 2023, Officer Barrieu's belt, badge, gun, Police ID, key card access and City ID  were wrongfully taken from him by Lt. Hughes, and he was again asked to resign.

38.    Lt. Hughes told Officer Barrieu that he was no longer an officer, and that if he said he was, he would be impersonating an officer.  This was untrue.   Officer Barrieu remained a sworn peace officer in the State of Alabama, and he works today in that capacity with another police department.

39.    On September 18, 2023, Officer Barrieu received notice of a disciplinary hearing the very next day.  Officer Barrieu asked for time to prepare, but Lt. Hughes gave him only one day, and told him that he had "no rights"  although he had a right to retain a representative to attend the hearing.

40.    On September 19, 2023, Officer Barrieu informed HPD Chief Giles of some of the discriminatory and hostile incidents that he had been experiencing in the police academy and during field training.  Chief Giles suspended the disciplinary hearing and

10

referred Officer Barrieu to the City EEO office.

41. Officer Barrieu was assigned desk work during the EEO investigation, and he was not allowed to complete field training. While working a desk, he was not afforded a raise that he would have received had he successfully completed field training.

### EEO Investigation

42. Some of the incidents about which Officer Barrieu complained were found to be substantiated by the EEO officer, KeArria Green.

43. It is the custom and practice of the City EEO office not to interview witnesses that are not currently employed with the City. Officer Barrieu was told specifically by Ms. Green that "we traditionally refrain from interviewing people who are not currently employed." In accordance with this City practice, Ms. Green did not interview Officer Barrieu's main witnesses, Officer Bell, Officer Roberts, Officer Veras, who were expected to substantiate many more of the comments and incidents, as well as the pervasively hostile atmosphere about which Officer Barrieu complained.

### Disciplinary Process and Termination

44. On or about January 12, 2024, Officer Barrieu's disciplinary hearing was re-convened.

45. Lt. Hughes recommended termination, based on her own illegal bias against Officer Barrieu and the illegal bias of the TA's and FTO's, due to his national origin.

46. Upon information and belief, some additional investigation into Officer Barrieu's performance was undertaken by Chief Giles.

47. Upon information and belief, it was impossible for Chief Giles to

11

independently investigate Officer Barrieu's performance, because each of the persons with whom Chief Giles would have spoken - those with significant personal knowledge of Officer Barrieu's performance - were illegally biased against Officer Barrieu based on his national origin.

48.   On or about February 16, 2024, Officer Barrieu was fired by Chief Giles, based on the illegally biased reports and recommendations of Lt. Hughes, and/or the TA's and the FTO's, and/or the defective EEO investigation.

49.   The offensive comments, unfair discipline, and unfair treatment as alleged herein, to which Officer Barrieu was subjected as a condition of his employment, resulted in a tangible employment action (termination) and have caused significant injury to the Plaintiff.

50.   The offensive comments, unfair discipline, unfair treatment as alleged herein were based upon Plaintiff's national origin.

## VI.   COUNT I - NATIONAL ORIGIN DISCRIMINATION

51.   Plaintiff realleges and incorporates by reference Paragraphs 1-50 above, to the extent not inconsistent herewith, with the same force and effect as if fully set out in specific detail herein.

52.   Defendant City of Huntsville willfully and maliciously discriminated against Plaintiff, with reckless disregard for his rights, by failing to provide a workplace free of discrimination in the terms, conditions, and privileges of his employment.  The conduct described herein constituted unlawful discrimination based upon national origin and violates Title VII of the Civil Rights Act of 1964, as amended.

12

53.     As a proximate result of Defendant's wrongful conduct, Plaintiff has been injured and damaged as follows: he has suffered extreme mental and emotional distress, pain and suffering, shame and humiliation, loss of enjoyment of life, injury to his reputation, and lost wages and benefits, healthcare expenses, and such damages will continue into the future.

WHEREFORE, the Plaintiff, Julien Barrieu, demands judgment against the Defendant for compensatory, and/or nominal damages, accumulated interest, attorneys' fees, costs, and expenses.

## COUNT VII - HOSTILE ENVIRONMENT

54.     Plaintiff realleges and incorporates by reference Paragraphs 1-50 above, to the extent not inconsistent herewith, with the same force and effect as if fully set out in specific detail herein.

55.     The working environment to which Plaintiff was subjected because of his national origin was severely hostile and the hostility was pervasive, such that it altered the conditions of Plaintiff's employment and created an abusive work environment.

56.     Lt. Hughes condoned and participated in the hostile environment to which Officer Barrieu was subjected. The City is vicariously liable for the wrongful actions of Lt. Hughes

57.     The City willfully and maliciously discriminated against him, with reckless disregard for his rights, by failing to provide him with a workplace free of discrimination in the terms, conditions and privileges of employment, by subjecting him to a harassing and hostile work environment, and subjecting him to unequal treatment, based on his national

13

origin. The conduct described herein constitutes unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended.

58. As a proximate result of Defendant's wrongful conduct, Plaintiff has been injured and damaged as follows: he has suffered extreme mental and emotional distress, pain and suffering, shame and humiliation, loss of enjoyment of life, injury to his reputation, and lost wages and benefits, healthcare expenses, and such damages will continue into the future.

WHEREFORE, the Plaintiff, Julien Barrieu, demands judgment against the Defendant for compensatory, and/or nominal damages, accumulated interest, attorneys' fees, costs, and expenses.

## VIII.   **COUNT III - RETALIATION**

59. Plaintiff realleges and incorporates by reference Paragraphs 1-50 above, to the extent not inconsistent herewith, with the same force and effect as if fully set out in specific detail herein.

60. Defendant City of Huntsville has engaged in retaliation against Plaintiff for complaining about the unlawful conduct alleged herein, and for opposing employment practices which Plaintiff believed to be unlawful, in violation of Title VII. After complaining Plaintiff was transferred to less desirable work. The retaliation was done wilfully and with malicious and reckless disregard for the rights of Plaintiff.

61. As a proximate result of Defendant's wrongful conduct, Plaintiff has been injured and damaged as follows: he has suffered extreme mental and emotional distress, pain and suffering, shame and humiliation, loss of enjoyment of life, injury to his reputation,

14

and lost wages and benefits, healthcare expenses, and such damages will continue into the future.

WHEREFORE, the Plaintiff, Julien Barrieu, demands judgment against the Defendant for compensatory, and/or nominal damages, accumulated interest, attorneys' fees, costs, and expenses.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court assumes jurisdiction of this action and after trial:

A.      Issues a declaratory judgment that the employment policies, practices, procedures, conditions and customs of Defendant are violative of the rights of Plaintiff, as secured by Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, 42 U.S.C. Section 2000e et seq. and the Civil Rights Act of 1991.

B.      Grants Plaintiff a permanent injunction enjoining Defendant City of Huntsville, its agents, successors, employees, attorneys and those acting in concert with and at the request of Defendants, from continuing to violate Title VII of the Act of Congress known as the "Civil Rights Act of 1964", as amended, 42 U.S.C. Section 2000e et seq. and the Civil Rights Act of 1991.

C.      Grants the relief requested hereinabove in each Count of Plaintiff's complaint, as well as such further and different relief as this Court deems right and proper.

_____
Julien Barrieu
*Pro Se Plaintiff*
307 Nature Walk Blvd
Huntsville, AL 35824
Phone: (859) 519-0030
E-mail: llaurenzo@yahoo.com

15

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY AS TO ALL CLAIMS TRIABLE BY A JURY.**

Julien Barrieu
*Pro Se Plaintiff*

16