FILED

2025 Jun-17  AM 09:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

JULIEN BARRIEU,                     }
                                    }
    Plaintiff,              }
                                    }
      v.                  }
                                    }   Case No.: 5:24-cv-01395-MHH
CITY OF HUNTSVILLE                  }
ALABAMA,                            }
                                    }
    Defendant.              }

## MEMORANDUM OPINION AND ORDER

Julien Barrieu has sued his former employer, the City of Huntsville, Alabama. (Doc. 1; Doc. 5). In his amended complaint, Mr. Barrieu alleges that the City discriminated against him based on his national origin, subjected him to a hostile work environment, and retaliated against him in violation of Title VII of the Civil Rights Act of 1964. (Doc. 5, pp. 13–15, ¶¶ 52–64). Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the City has moved to dismiss Mr. Barrieu's retaliation claim. (Doc. 13). This opinion addresses the City's motion.

***

Rule 12(b)(6) allows a defendant to move to dismiss claims within a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P.

1

12(b)(6). A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint against the "liberal pleading standards set forth by Rule 8(a)(2)." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In deciding a Rule 12(b)(6) motion to dismiss, a court must view the allegations in a complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). A court must accept well-pleaded facts as true. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000).

***

Mr. Barrieu was born in France and moved to the United States. (Doc. 5, pp. 2, 3, ¶¶ 4, 13). The City hired him as a police cadet in February of 2023. (Doc. 5, p. 3, ¶ 11). That July, Mr. Barrieu graduated from the Huntsville Police Academy "and became a sworn peace officer of the State of Alabama and a sworn probationary

officer of the Huntsville Police Department." (Doc. 5, p. 3, ¶ 11). Mr. Barrieu then started field training "to become a regular member of the HPD." (Doc. 5, p. 3, ¶ 12).

Mr. Barrieu alleges that, shortly after the City hired him, he "was regularly and continuously subjected to derogatory comments" and "unfair discipline" and "unfairly held to higher performance standards than cadets and police officers native to the United States." (Doc. 5, p. 3, ¶ 14). While at the police academy, instructors "regularly and continuously made offensive comments to" Mr. Barrieu. (Doc. 5, pp. 3–4, ¶ 15). For example, an instructor told Mr. Barrieu that "the French are a bunch of p – ssies, they never won a war." (Doc. 5, p. 4, ¶ 15). When an officer had Mr. Barrieu pinned to the ground during a training exercise, the officer "stated that France had never won wars, asked who was going to save [him] now, asked if [he] was going to surrender since there were no Americans to save him, stated that the Americans would not save him like they did at Normandy, and told [him] to call the Americans for help if he wanted to be released." (Doc. 5, p. 4, ¶ 15).

Instructors questioned Mr. Barrieu's "command of the English language" and "understanding of American culture." (Doc. 5, pp. 4–5, ¶ 16). Instructors also questioned Mr. Barrieu's loyalty to the United States. (Doc. 5, p. 6, ¶ 18). One instructor made Mr. Barrieu "stand by the American flag and recite the pledge of allegiance over and over as a punishment for cramping during a physical training test." (Doc. 5, p. 6, ¶ 19). Though Mr. Barrieu excelled on his objective evaluations,

3

instructors gave him lower marks than American-born classmates on subjective tests. (Doc. 5, p. 7, ¶ 20). One instructor pressured Mr. Barrieu's classmates to "make [him] quit." (Doc. 5, p. 7, ¶ 21).

The department assigned Mr. Barrieu to a field training officer who "ha[d] a history of" training officers "who ha[d] been singled out[] as persons who the Academy command officers and the [instructors] d[id] not want to have the opportunity to successfully complete field training." (Doc. 5, p. 8, ¶ 24). During field training, the department's alleged discrimination and harassment of Mr. Barrieu continued, as did the alleged criticism of his performance. (Doc. 5, pp. 8–10, ¶¶ 26–34).

Lieutenant Hughes was the Director of the Police Academy. (Doc. 5, p. 8, ¶ 23). On August 30, 2023, Lt. Hughes called Mr. Barrieu into her office and directed him to sign a performance contract "which required him to cure his perceived performance deficiencies by September 15, 2023, or face termination." (Doc. 5, p. 9, ¶ 33). Lt. Hughes required Mr. Barrieu to sign a performance contract, even though he "was performing at least as well as native born" trainees. (Doc. 5, pp. 9–10, ¶ 34). One week later, Lt. Hughes asked Mr. Barrieu to resign. (Doc. 5, p. 10, ¶ 36). "When he refused, Lt. Hughes told [him] that she had already decided not to recommend him for a permanent HPD position, and that there was nothing he could do, even if he made all '7s' (excelled)." (Doc. 5, p. 10, ¶ 36). On September 15,

4

2023, Lt. Hughes took Mr. Barrieu's "belt, badge, gun, Police ID, key card access[,] and City ID."  (Doc. 5, p. 10, ¶ 38).  She informed him "that he was no longer an officer, and that if he said he was, he would be impersonating an officer."  (Doc. 5, p. 10, ¶ 39).

On September 19, 2023, the department held a disciplinary hearing concerning Mr. Barrieu.  (Doc. 5, p. 11, ¶¶ 40–41).  During the hearing, Mr. Barrieu complained to HPD Chief Giles about "the discriminatory and hostile incidents that [Mr. Barrieu] had been experiencing in the police academy and during field training."  (Doc. 5, p. 11, ¶ 41).  "Chief Giles suspended the disciplinary hearing and referred Officer Barrieu to the City EEO office."  (Doc. 5, p. 11, ¶ 41).  While the City investigated Mr. Barrieu's complaint, the HPD assigned him to desk work and did not allow him to complete field training.  (Doc. 5, p. 11, ¶ 42).  Mr. Barrieu "was not afforded a raise that he would have received had he successfully completed field training."  (Doc. 5, p. 11, ¶ 42).  The department reconvened Mr. Barrieu's disciplinary hearing in January of 2024 and terminated him the following month.  (Doc. 5, p. 12, ¶¶ 45–49).

Mr. Barrieu alleges that the City retaliated against him after he complained about the HPD's conduct toward him.  (Doc. 5, p. 15, ¶ 63).  According to Mr. Barrieu, after he complained, the City transferred him to "less desirable work."  (Doc. 5, p. 15, ¶ 63).

\*\*\*

Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice," including discrimination. 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). An employee may prosecute a retaliation claim using circumstantial evidence that an employer retaliated against the employee after the employee opposed discrimination. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023) (citations omitted) (outlining circumstantial evidence standard at summary judgment stage). "Evidence that is likely to be probative is 'evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext.'" *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 n.2 (11th Cir. 2023) (quotation omitted); *see also Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1198 (11th Cir. 2024) (citation omitted).

The City argues that Mr. Barrieu has not stated a claim for retaliation because the City took steps to terminate him before he complained about discrimination. (Doc. 13, pp. 3–8; Doc. 9). According to the City, Mr. Barrieu's allegations concerning the scheduling of a disciplinary hearing and the taking of his police gear and credentials show that the City had "contemplated reassigning [Mr. Barrieu] to

desk duty (if not outright reassigning him) prior to his complaint of discrimination." (Doc. 9, p. 5).

The City points out that Mr. Barrieu's allegations evidence the City's intent to terminate him before his disciplinary hearing, (*see* Doc. 5, pp. 9, 10, ¶¶ 33, 36), but Mr. Barrieu's retaliation claim does not rest on his termination. Mr. Barrieu asserts that the City retaliated against him by assigning him to desk duty. (Doc. 5, p. 15, ¶ 63). An employee may bring a Title VII retaliation claim based on an employer's alleged demotion of the employee following a complaint of discrimination. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Here, Mr. Barrieu has alleged that his reassignment to desk duty constituted a demotion because after his reassignment, he did not receive "a raise that he would have received had he successfully completed field training." (Doc. 5, p. 11, ¶ 42).

Mr. Barrieu has alleged facts sufficient to support his retaliation claim at this stage of the proceedings. According to Mr. Barrieu, the City reassigned him after he complained of discrimination. (Doc. 5, p. 11, ¶ 42). Taken as true, this allegation provides evidence of "'suspicious timing.'" *See Tynes*, 88 F.4th at 946 n.2 (quotation omitted). Mr. Barrieu has alleged that the department treated American-born officers differently from him. *See Tynes*, 88 F.4th at 946 n.2. For example, Lt. Hughes required Mr. Barrieu to sign a performance contract, even though he "was

performing at least as well as native born" trainees.  (Doc. 5, pp. 9–10, ¶ 34); (*see also* Doc. 5, p. 7, ¶ 20).  She did not ask the same of American-born officers.

Mr. Barrieu has alleged facts concerning pretext.  *See Tynes*, 88 F.4th at 946 n.2.  Mr. Barrieu alleges that he excelled on his objective evaluations, but instructors gave him lower marks than American-born classmates on subjective tests and pressured Mr. Barrieu's classmates to "make [him] quit."  (Doc. 5, p. 7, ¶¶ 20–21).  The police department singled out Mr. Barrieu for training with an officer who trained individuals that the department did "not want to have the opportunity to successfully complete field training."  (Doc. 5, p. 8, ¶ 24).

***

Accordingly, the Court denies the City's motion to dismiss.  The Clerk of Court shall please TERM Doc. 13.

**DONE** and **ORDERED** this June 17, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE